CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

DEC 20 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **TERESA F. ESTEP,** | ) | |
| Plaintiff, | ) | Civil Action No. 1:07cv00014 |
| | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,**[1] | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, this court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Teresa F. Estep, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were

---

[1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007, and is therefore, substituted for Jo Anne B. Barnhart as the defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 1:07-cv-00014-GMW-PMS   Document 13   Filed 12/20/07   Page 1 of 22   Pageid#: 341

reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Estep filed her application for DIB on January 20, 2004, alleging disability as of December 1, 2002, due to high blood pressure, diabetes, knee pain, left hip pain, arthritis, nerve problems, depression, crying spells, headaches and heart problems. (Record, ("R."), at 51-55.) The claim was denied initially and upon reconsideration. (R. at 30-31.) Estep then timely requested a hearing before an administrative law judge, ("ALJ"), on October 21, 2004. (R. at 43.) The ALJ held a hearing on October 20, 2005, at which Estep was represented by counsel. (R. at 265-96.)

By decision dated May 26, 2006, the ALJ denied Estep's claim. (R. at 14-22.) The ALJ found that Estep met the disability insured status requirements of the Act for DIB purposes through December 31, 2005. (R. at 16.) The ALJ found that Estep had not engaged in substantial gainful activity at any time relevant to his decision. (R. at 16.) The ALJ also found that the medical evidence established that Estep suffered from severe impairments, namely osteoarthritis of both knees and major depressive disorder, but he found that Estep did not have an impairment or combination of impairments listed at or medically equal to one listed at 20

-2-

C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-19.) Additionally, the ALJ determined that Estep retained the residual functional capacity, ("RFC"), to perform medium level exertion.[2] (R. at 19-21.) Specifically, the ALJ determined that Estep was able to occasionally stoop, kneel, crouch and crawl. (R. at 19.) Further, the ALJ determined that Estep had a fair ability to relate to co-workers; deal with the public; interact with supervisors; understand, remember and carry out detailed and simple job instructions; and relate predictably in social situations. (R. at 19.) The ALJ also found that Estep had a poor ability to deal with work stresses; function independently; maintain attention and concentration; understand, remember and carry out complex job instructions; behave in an emotionally stable manner; and demonstrate reliability. (R. at 19, 242-43.) Because Estep's past relevant work did not require the performance of work related activities precluded by her RFC, the ALJ found that Estep was able to perform her past relevant work as a security officer. (R. at 21.) Thus, the ALJ found that Estep was not disabled under the Act and was not eligible for benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(f) (2007).

After the ALJ issued his decision, Estep pursued her administrative appeals, (R. at 11), but the Appeals Council denied her request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 5-7.) *See* 20 C.F.R. § 404.981 (2007). Thereafter, Estep filed this action seeking review of the ALJ's unfavorable decision. This case is before the court on Estep's Motion for

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting of items weighing up to 25 pounds. *See* 20 C.F.R. § 404.1567(c) (2007). If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2007).

Case 1:07-cv-00014-GMW-PMS   Document 13   Filed 12/20/07   Page 3 of 22   Pageid#: 343

Summary Judgment filed September 12, 2007, and on the Commissioner's Motion for Summary Judgment filed September 26, 2007.

## II. Facts

Estep was born in 1954, which classifies her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d) (2007). (R. at 268.) Estep has a ninth-grade education, can read and write and has past work experience as a security officer. (R. at 269-70.)

At Estep's hearing, on October 20, 2005, she testified that she last worked in December 2002 as a security officer. (R. at 270.) Estep testified that she has had pain in both knees since the year 2000 and that her doctor has recommended knee replacement. (R. at 272-73.) Estep described the pain as tearing and grinding and noted that it causes swelling in her calf muscles. (R. at 272-73.) Estep also testified that she was disabled because of her non-insulin dependent diabetes. (R. at 274.) Estep noted that she has had diabetes for 10 to 12 years and she currently takes four medications to help control her sugar levels. (R. at 274-75.) Estep also testified that she was disabled because of left hip pain, for which she takes pain medication daily. (R. at 275-76.) Estep described her left hip pain as a burning, sharp pain. (R. at 276.) Estep also testified she was disabled because of right shoulder problems, high blood pressure, lightheadedness, arthritis in all her joints and nerve problems. (R. at 277-81.) Estep testified that she does not like to be around others. (R. at 281.) Estep noted that she lives at home with her 25-year-old son, a mentally challenged sister and her husband. (R. at 281-83.)

-4-

Estep stated that she could probably lift a gallon of milk, stand comfortably for about ten minutes, walk about fifty yards without stopping, sit about twenty minutes and that she could not bend over or squat. (R. at 284-86.) Estep also stated that she could wash dishes, perform light housework and go grocery shopping, all with the help of her son. (R. at 284-87.) Estep stated that she tries to go to church every Sunday and that she used to quilt, but can no longer do so. (R. at 287.) Estep testified that she quit her job as a security officer because she felt she could no longer perform the job well. (R. at 289-90.) She stated that her nerves also started bothering her and that she is now taking multiple medications to help her remain calm, relax and sleep. (R. at 291.) Estep also testified that she is burdened with helping take care of her husband, who is disabled, and her sister, who is mentally challenged. (R. at 292-93.) During the proceeding, Estep stood up, and she noted that she had to stand up because of burning hip pain. (R. at 288.)

Gina Baldwin, a vocational expert, also testified at Estep's hearing. (R. at 289-94.) Baldwin described Estep's past relevant work as a security officer as work that ranged from sedentary[3] to light,[4] unskilled to semiskilled. (R. at 289.) The ALJ asked Baldwin if any jobs would be available for a hypothetical individual who was 51 years of age, had a ninth grade education and had the same training and work experience as Estep. (R. at 293.) The ALJ further added that this individual would have exertional impairments that would only allow medium

---

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* C.F.R. § 404.1567(a) (2007).

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. § 404.1567(b) (2007). If an individual can perform light work, she can also perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2007).

work, with the ability to occasionally stoop, kneel, crouch and crawl. (R. at 293.) Baldwin stated that the hypothetical individual could perform Estep's past work. (R. at 293.) Baldwin also testified that there were jobs that existed in significant numbers in the regional and national economies for sedentary, light and medium level work. (R. at 294.) Baldwin testified that sedentary work jobs were available such as a surveillance system monitor or a bench assembler, light work jobs were available such as a product inspector or a machine tender and medium jobs were available such as a kitchen helper and a hand packager. (R. at 294.) Baldwin stated that these job classifications were consistent with the Dictionary of Occupational Titles, ("DOT"). (R. at 294.) Further, Baldwin testified that Estep would not be able to perform any jobs, including her past relevant work, if Estep's testimony was considered credible and supported by medical evidence in the record. (R. at 294.)

In rendering his decision, the ALJ reviewed medical records from Timothy J. Carbary, Ph.D.; Dr. Faisal Chaudhry, M.D.; Dr. Dilip Patel, M.D.; Dr. Susan Lester, M.D.; Dr. Amjad Husain, M.D.; Dr. Nagaraja Vish, M.D.; Keen Mountain Medical Center; Keen Mountain Medical Clinic; Keen Mountain Medical Associates; Buchanan General Hospital; Buchanan Orthopedics; Dr. Shital N. Parikh, M.D.; Howard Leizer, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; and Richard M. Surrusco, M.D., a state agency physician. In reviewing the ALJ's decision, the Appeals Council considered additional evidence from Timothy J. Carbary, Ph.D.[5]

---

[5] Because the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-6-

The record shows that Estep presented to Dr. Amjad Husain, M.D., of Keen Mountain Medical Center, ("KMMC"), on July 17, 1998, for an evaluation of Estep's diabetes and hypertension. (R. at 184.) Estep was encouraged to follow a specific diet and to continue exercising regularly. (R. at 186.) Estep returned to KMMC on September 14, 1998, and saw Janet S. Looney, F.N.P., for a follow up on her diabetes. (R. at 182.) Looney noted that Estep was walking about eight hours a week. (R. at 182.) Estep reported that that she had a great deal of stress on her because her husband was unemployed due to a work-related injury. (R. at 183.) Estep also reported that she was depressed because of loss of income and independence, and that she cried frequently. (R. at 183.)

Estep was seen at KMMC on November 13, 1998, and February 22, May 21, June 21, and September 13, 1999, and January 14, 2000 for follow-up visits regarding her diabetes and blood pressure.[6] (R. at 168-81.) At her November 13th visit, Estep was diagnosed with depression after she again reported that she was having trouble coping with her husband's unemployment and that her husband's depression caused her depression to worsen. (R. at 180.) Estep presented to Dr. Husain on March 13, 2000, complaining of right hip pain due to a sprain caused by a fall. (R. at 166-67.) A musculoskeletal exam revealed tenderness in Estep's right greater trochanter area and painful inversion/eversion at the hip. (R. at 166.) Estep was seen by Dr. Husain on September 22, 2000, for a follow up on her hip pain. (R. at 162.) Dr. Husain's exam revealed pain in Estep's right hip, which radiated down her right lower extremity. (R. at 162.) Estep was given a trigger

---

[6] These visits were made mainly for medication refills.

Case 1:07-cv-00014-GMW-PMS   Document 13   Filed 12/20/07   Page 7 of 22   Pageid#: 347

point injection in the right greater trochanter area to help with the pain. (R. at 162.) On April 18, 2001, Estep reported pain in the left upper quadrant of her abdomen and an exam by Dr. Husain revealed tenderness at the lower edge of her ribcage. (R. at 160.) Estep again presented to Dr. Husain on August 22, 2002, for a follow up on her diabetes and hypertension. (R. at 157.) At that visit, Dr. Husain noted that Estep had a normal range of motion with some pain at the knees, hips and shoulders. (R. at 157.) On December 17, 2003, Estep again saw Dr. Husain and complained of extreme anxiety and sleep difficulty, which she attributed to a custody battle regarding her sister. (R. at 155.) Dr. Husain described Estep as being emotionally unstable and prescribed her Vistaril as needed. (R. at 155.)

On January 13, 2004, Estep presented to Dr. Susan Lester, M.D., of KMMC, complaining of knee pain as a result of a fall. (R. at 154.) Dr. Lester's examination revealed minimal ecchymosis over the lateral aspect and no edema or effusion. (R. at 154.) Estep returned to KMMC on March 30, 2004, and saw Dr. Nagaraja Vish, M.D. (R. at 153.) Estep complained of pain over the left hip and pain over both knee joints. (R. at 153.) Dr. Vish's examination revealed tenderness over the anterior and lateral aspect of the left hip joint, normal hip joint movements, no deformity or swelling of the hip joint and diffuse tenderness present around the hip joint and both knee joints. (R. at 153.) Along with Estep's knee and hip pain, Dr. Vish also diagnosed Estep with generalized anxiety disorder. (R. at 153.)

Estep returned to Dr. Vish on May 25 and July 22, 2004, for a follow up regarding her pain in both knee joints, and Dr. Vish noted on both visits that there were no significant changes from Estep's visit on March 30, 2004. (R. at 151-52.)

-8-

Estep returned to KMMC on September 15, 2004, where she complained of falling and landing on her right forearm. (R. at 150.) On that date, Dr. Vish diagnosed Estep with a contusion injury to her right forearm and noted tenderness in the right forearm area. (R. at 150.) On January 12, 2005, Dr. Vish prescribed Estep Percocet to treat her left shoulder and knee pain in both knee joints. (R. at 223.) Estep returned on March 15, 2005, May 10, 2005, July 12, 2005, September 6, 2005, complaining of knee pain in both joints. (R. at 221-22, 229, 234-35.)

On June 11, 2004, Dr. Faisal Chaudhry, M.D., completed a medical consultant report at the request of the Virginia Department of Rehabilitative Services. (R. at 143-46.) Estep's chief complaints included chronic bilateral knee pain and diabetes mellitus. (R. at 143-45.) Chaudhry also noted that Estep complained of mild anxiety symptoms, which had occurred for the last year. (R. at 144.) Estep reported to Chaudhry that she was anxious "on and off." (R. at 144.) Chaudhry diagnosed Estep with bilateral knee tendonitis, chronic mechanical hip pain, diabetes mellitus and chronic hypertension. (R. at 145.) Chaudhry noted that Estep did not seem to have any significant pain, swelling or instability of any joint, but did complain of pain when squatting or standing. (R. at 146.) Chaudhry found Estep's diabetes mellitus to be under control, found that she was able to sit, stand and walk five to six hours in a typical eight-hour work day and found she was able to kneel, crawl and squat only occasionally due to her subjective pain. (R. at 146.) On June 11, 2004, Dr. Dilip Patel, M.D., a radiologist from Richlands Diagnostic Radiology, Inc., reported that x-rays taken of Estep's right knee revealed minimal osteoarthritis but no other demonstrable abnormalities. (R. at 147.)

Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique Form for Estep on June 30, 2004. (R. at 195-209.) Tenison indicated that Estep suffered from an anxiety-related disorder that was not severe. (R. at 195.) Tenison also indicated that Estep had no restrictions of activities of daily living, mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and no episodes of decompensation. (R. at 205.) Tenison indicated that Estep's mental allegations were not fully credible and that her mental limitations appeared non-severe. (R. at 207.) Howard Leizer, Ph.D., another state agency psychologist, reviewed Tenison's report and affirmed his findings on September 29, 2004. (R. at 195-209.)

Dr. Frank M. Johnson, M.D., a state agency physician, completed a physical residual functional capacity assessment on July 19, 2004. (R. at 210-19.) Dr. Johnson indicated that Estep had the residual functional capacity to perform medium work. (R. at 210-19.) Dr. Johnson also reported that Estep could stand and/or walk and sit with normal breaks for about six hours in an eight-hour workday and that Estep had limited ability to push and/or pull in her lower extremities because of her knee problems. (R. at 211.) Dr. Johnson indicated that Estep could frequently climb and balance and could occasionally stoop, kneel, crouch and crawl. (R. at 212.) Further, Dr. Johnson found that Estep had no manipulative, visual, communicative or environmental limitations. (R. at 213-14.) Additionally, Dr. Johnson found that Estep's alleged symptoms and related limitations were not fully credible. (R. at 219.) Dr. Richard M. Surrusco, M.D., another state agency physician, reviewed Dr. Johnson's report and affirmed his findings on September 29, 2004. (R. at 217.)

On September 13, 2004, Estep had x-rays taken of her right knee, which revealed incidental findings of osteoarthritis. (R. at 187.) Estep presented to Dr. Vish on November 12, 2004, complaining of intermittent worsening of the pain over both knee joints. (R. at 224.) Dr. Vish's knee joint examination revealed no significant change or worsening from his previous examination. (R. at 224.) On January 2, 2005, a knee joint examination by Dr. Vish was unremarkable except for mild diffuse tenderness around both knees, while Estep's shoulder examination revealed tenderness over the superomedial angle of the left scapula, but no swelling. (R. at 223.) On March 15 and May 10, 2005, Estep presented to Dr. Vish for a follow up, complaining of pain and intermittent swelling over both knee joints. (R. at 221.) At Estep's March 15 visit, Dr. Vish noted that Estep's knee examination revealed no significant changes, while Dr. Vish's knee joint examination on May 10 was unremarkable with the exception of tenderness around both knee joints. (R. at 221.)

On July 12, 2005, Estep presented to Dr. Vish, complaining of pain over the right shoulder joint and intermittent swelling of both knee joints. (R. at 235.) Dr. Vish's right shoulder joint examinations revealed no deformity or swelling, full range of motion with pain beyond 90 degrees flexion and abduction and diffuse tenderness around the right shoulder joint. (R. at 235.) A right knee exam performed by Dr. Vish on September 6, 2005, was unremarkable except that the exam revealed diffuse tenderness around both knee joints. (R. at 234.) On September 21, 2005, Estep presented to Dr. Vish, complaining of generalized fatigue that had lasted for one week, depressive symptoms and lack of energy. (R. at 232.) Estep also informed Dr. Vish that she had lost interest in social activities. (R. at 232.) Dr. Vish prescribed Lexapro for Estep's depression. (R. at 232.)

On November 12, 2005, Estep underwent a psychological evaluation by Timothy Carbary, Ph.D., at her attorney's law office. (R. at 237-41.) Carbary based his evaluation on information he learned from having personally spent approximately one hour with Estep. (R. at 237.) An assistant of Carbary, Steven Cornett, M.A., spent approximately two hours with Estep during the administration of psychometric tests. (R. at 237.) Carbary noted that Estep showed considerable anguish and tearfulness when personal topics were raised in the interview. (R. at 237.) Carbary also noted that Estep had a personal history of being subject to molestation when she was a child of about six years old. (R. at 238.) Further, Carbary reported that Estep was often stressed because she was not able to afford many of her medications. (R. at 239.)

Carbary administered the Weschler Adult Intelligence Scale-Revised, ("WAIS-III"), and Estep achieved a full scale IQ of 95. (R. at 240.) Carbary diagnosed major depressive disorder, single episode, moderate; generalized anxiety disorder, with panic attacks; a likely reading disorder; multiple orthopedic problems; diabetes and hypertension; and significant, multiple psychosocial stressors. (R. at 240.) Carbary found that Estep's global assessment functioning score, ("GAF") was 52.[5] (R. at 240.) On the Wide Range Achievement Test-Revision 3, ("WRAT"), Estep's reading score was equivalent to the seventh-grade level. (R. at 240.)

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational or school functioning ...." DSM-IV at 32.

Carbary also completed a medical assessment of Estep's mental ability to perform work-related activities. (R. at 242-44.) Carbary indicated that Estep had a more than satisfactory ability to follow work rules and use judgment; a limited but satisfactory ability to relate to co-workers, deal with the public and interact with supervisors; and a seriously limited but not precluded ability to deal with work stresses, function independently and maintain attention and concentration. (R. at 242.) Carbary's assessment also indicated that Estep had a seriously limited but not precluded ability to understand, remember and carry out complex job instructions, behave in a emotionally stable manner and demonstrate reliability; a limited but satisfactory ability to understand, remember and carry out detailed, but not complex job instructions and to understand, remember and carry out simple job instructions. (R. at 243.) He also reported that she had a more than satisfactory ability to maintain personal appearance. (R. at 243.)

On January 22, 2006, Estep presented to the Buchanan General Hospital emergency room, complaining of pain in her right shoulder area. (R. at 246-56.) An x-ray of the chest revealed no superimposed acute cardiac, pulmonary or pleural pathology. (R. at 253.) Additionally, x-rays of the ribs revealed no demonstrable traumatic bony pathology and x-rays of the right shoulder joint revealed no demonstrable bony or joint pathology. (R. at 255.) An x-ray of the cervical spine revealed mild degenerative disc disease at the C6-C7 level of the spine and at the C5-C6 level of the spine; however, the x-ray did not reveal any fracture and the prevertebral soft tissues were within normal limits. (R. at 256.) Estep was discharged with a prescription for Percocet and instructed to follow up with Dr. Vish. (R. at 250.)

Estep presented to Dr. Vish on January 23, 2006, for a follow up to her ER visit. (R. at 258-59.) Estep continued to complain of right shoulder pain. (R. at 258-59.) Dr. Vish diagnosed multiple contusions of the right shoulder joint, right arm and right lateral chest wall and Estep was prescribed Percocet and Voltaren and told to use a moist heat pack over tender areas. (R. at 258-59.) On March 6, 2006, Estep reported to Dr. Shital N. Parikh, M.D., of Buchanan Orthopedics, complaining of continued right shoulder pain. (R. at 261-63.) Estep was diagnosed with rotator cuff tendonitis and AC joint arthritis, carpal tunnel syndrome of the right wrist and C7-C8 radiculopathy. (R. at 261-63.) Dr. Parikh gave Estep a cortisone shot and instructed her to have nerve conduction studies completed.

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *see also Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. If the claimant is able to establish a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the RFC, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall v. Harris*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 26, 2006, the ALJ denied Estep's claim. (R. at 14-22.) The ALJ found that Estep met the disability insured status requirements of the Act for DIB purposes through December 31, 2005. (R. at 16.) The ALJ found that Estep had not engaged in substantial gainful activity at any time relevant to his decision. (R. at 16.) The ALJ also found that the medical evidence established that Estep suffered from severe impairments, namely osteoarthritis of both knees and major depressive disorder, but he found that Estep did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-19.) Additionally, the ALJ determined that Estep retained the residual functional capacity, ("RFC"), to perform medium level exertion. (R. at 19-21.) Specifically, the ALJ determined that Estep was able to occasionally stoop, kneel, crouch and crawl. (R. at 19.) Further, the ALJ determined that Estep had a fair ability to relate to co-workers; deal with the public; interact with supervisors; understand, remember and carry out detailed and simple job instructions; and relate predictably in social situations. (R. at 19.) The ALJ also found that Estep had a poor ability to deal with work stresses;

-15-

function independently; maintain attention and concentration; understand, remember and carry out complex job instructions; behave in an emotionally stable manner; and demonstrate reliability. (R. at 19, 242-43.) Because Estep's past relevant work did not require the performance of work related activities precluded by her RFC, the ALJ found that Estep was able to perform her past relevant work as a security officer. (R. at 21.) Thus, the ALJ found that Estep was not disabled under the Act and was not eligible for benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(f) (2007).

Estep argues that the ALJ erred in finding that she did not meet a listing for anxiety and depression. ("Brief In Support Of Plaintiff's Motion for Summary Judgment," ("Plaintiff's Brief"), at 9-12.) Specifically, Estep argues that she meets the listing for depression and anxiety found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Plaintiff's Brief at 10.)

The court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). The ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to the evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Estep argues that that the ALJ erred by not finding that she met or equaled the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04, 12.06. (Plaintiff's Brief at 9-12.) I disagree. With regard to Listing 12.04, Estep argues that she meets the "A" and the "B" criteria. Listing 12.04 states, in pertinent part:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied . . .
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome . . .
> 2. Manic syndrome . . .

-17-

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

. . .

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04 (2007).

Likewise, Estep argues that the ALJ erred in finding that she did not meet or equal the requirements of the listed impairment for anxiety related disorders found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06. With regard to Listing 12.06, Estep appears to argue that she meets the "A" and the "B" criteria. Listing 12.06 states, in pertinent part:

12.06 Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied . . .

A. Medically documented findings of at least one of the following:

-18-

1. Generalized persistent anxiety . . .
2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress; or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

. . .

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06 (2007).

In regard to the listings found in Section 12.00, the ALJ found that Estep met some of the "A" criteria, but not the "B" criteria.[7] (R. at 18.) Estep asserts that she meets the "A" criteria, and that the argument in this case hinges on whether the ALJ erred in finding that Estep did not meet the "B" criteria of Sections 12.04 and 12.06, which are identical in nature. (Plaintiff's Brief at 11.) While it is not clear that the ALJ held Estep met the "A" criteria, the undersigned

---

[7] The ALJ's finding that Estep does not meet the "C" criteria of Section 12.06 is not contested. (R. at 19.) If the Plaintiff's Brief can somehow be construed to suggest an argument that Estep meets the "C" criteria, that argument would have no merit because substantial evidence exists in the record to support the ALJ's finding that Estep does not meet the "C" criteria.

-19-

will assume that such is the case, because Estep must show that substantial evidence does not exist to support a finding that she has not met both the "A" criteria and the "B" criteria. Because I find that substantial evidence exists in the record to support the ALJ's finding that Estep did not meet the "B" criteria, whether she met the "A" criteria is of no concern.

Estep's argument that she meets or equals the "B" criteria of Sections 12.04 and 12.06 rests solely upon the opinion of Timothy J. Carbary, Ph.D., and the ALJ's finding that Estep has poor ability in six areas of functioning. (Plaintiff's Brief at 11.) In the Plaintiff's Brief, Estep's counsel states that, "[a]lthough she does not have marked limitations in the areas, she has sufficient enough poor abilities to meet or equal the listing." (Plaintiff's Brief at 11.) Although, Carbary diagnosed Estep with anxiety and depression, he opined that Estep had a good ability to follow work rules, use judgment and maintain personal appearance; and a fair ability to relate to co-workers, to deal with the public, to interact with supervisors, to understand, remember and carry out detailed and simple job instructions and to relate predictably in social situations. (R. at 242-44.) Additionally, Tenison and Leizer found that Estep had no restrictions in activities of daily living; none-to-mild limitations in social functioning; mild limitations in maintaining concentration, persistence and pace and no episodes of decompensation. (R. at 255.) Tenison and Leizer also found Estep's mental allegations not fully credible and noted that her mental limitations appeared to be non-severe. (R. at 207.) Estep's own reports of her activities of daily living, including caring for her mentally disabled sister, contradict her allegations about the severity of her symptoms. (R. at 281-88.) Likewise, the record indicates that

-20-

she is able to take care of her own personal hygiene needs, shop, pay bills, take her medication without reminders and perform light household chores. (R. at 265-96.) Moreover, Estep's complaints to her treating primary care physicians were not severe. (R. at 155, 253.)

Furthermore, the regulations specify that the responsibility for making the determination of whether a claimant is disabled is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e) (2007). In doing so, the Commissioner must review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. *See* 20 C.F.R. § 404.1527(e) (2007). Based on my review of the record, I find that the ALJ has properly reviewed the medical evidence and that substantial evidence exists to support his finding that Estep does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Thus, I find that substantial evidence exists to support the ALJ's finding with regard to Estep's RFC.

## IV. Conclusion

For the foregoing reasons, I sustain the Commissioner's Motion for Summary Judgment and overrule Estep's Motion for Summary Judgment. The Commissioner's decision denying benefits is affirmed.

An appropriate order will be entered.

DATED:    This 20th day of December 2007.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

Case 1:07-cv-00014-GMW-PMS   Document 13   Filed 12/20/07   Page 22 of 22   Pageid#: 362